**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Donald JENNINGS and Charles Blasco,
Defendants-Appellants.**

**No. 79–1195.**

United States Court of Appeals,
Seventh Circuit.

Argued June 15, 1979.

Decided Aug. 6, 1979.

See also 7 Cir., 581 F.2d 681.

Jeffrey B. Steinback, Chicago, Ill., for defendants-appellants.

Thomas P. Sullivan, U. S. Atty., Cynthia Giacchetti, Asst. U. S. Atty., Chicago, Ill., for plaintiff-appellee.

Before FAIRCHILD, Chief Judge, SWYGERT and PELL, Circuit Judges.

SWYGERT, Circuit Judge.

Defendants-appellants Charles Blasco and Donald Jennings were convicted of misprision of a felony in violation of 18 U.S.C. § 4. Although on appeal defendants offer a number of reasons why their convictions should be overturned, we treat only one issue: whether the federal misprision statute, 18 U.S.C. § 4, as applied in this case, violates defendants' Fifth Amendment privilege against self-incrimination. We conclude that it does and, accordingly, we reverse.

I

Defendants, both Chicago police officers, were charged in an eight-count indictment with engaging in a pattern of solicitation and acceptance of bribes from narcotics dealers. Count I of the indictment charged both defendants with misprision of a felony, 18 U.S.C. § 4, for failing to disclose and subsequently concealing from authorities that Sam Johnson possessed and distributed a quantity of heroin.[1] Count II charged both defendants and Count III charged defendant Jennings with this same offense in connection with drug offenses perpetrated by other individuals. Counts IV and V alleged that defendant Jennings knowingly and intentionally distributed narcotics in violation of 21 U.S.C. § 841(a)(1). Count VI charged defendant Blasco and Count VII charged defendant Jennings with racketeering activity, including the solicitation and acceptance of bribes to promote drug trafficking, in violation of 18 U.S.C. § 1962(c). Count VIII alleged that both defendants

---

1. Title 18, U.S.C., Section 4 states:
   Misprision of felony
   Whoever, having knowledge of the actual commission of a felony cognizable by a court of the United States, conceals and does not as soon as possible make known the same to some judge or other person in civil or military authority under the United States, shall be fined not more than $500 or imprisoned not more than three years, or both.

conspired with other, unindicted coconspirators to violate the racketeering provisions of 18 U.S.C. § 1962(d).

The evidence adduced at trial showed the following.[2] During 1973 and 1974 both defendants were assigned to the Tactical Unit of the Seventh District of the Chicago Police Department to investigate narcotics trafficking in the district. Defendants used Whitelaw Abrams, a person familiar with the drug trade in the area, as an informant during a portion of this period.[3] During the period in question, Abrams would identify drug law offenders and locations where drug transactions took place. Defendants, often with Abrams' assistance, would then "arrest" probable lawbreakers. But instead of formally arresting and charging these violators, defendants would accept money and/or narcotics in exchange for the offenders' release.

In January 1974 defendants and Abrams drove past an intersection on the south side of Chicago which was frequented by narcotics dealers. One of the defendants suggested that, "It would be nice if we can get a foot in the door." The following day Abrams returned to the area and met with an acquaintance who took him to a "dope house" in the neighborhood. Abrams purchased a $25.00 package of heroin and then returned to the house daily for three or four days.

Several days later Abrams told defendants that he had a "bust" involving a dope house in the area. At approximately 8:30 that evening he and defendants drove to the house Abrams previously had visited and defendants gave Abrams $25.00. Abrams went into the house and knocked on the door of the apartment where he had purchased drugs. Sam Johnson, previously unknown to Abrams, answered the door and a drug sale was consummated. Abrams returned to the car, showed defendants the drugs, and told them that the house "looked fairly easy."

Defendants and Abrams drove off to obtain some tools to enable them to break into the house. They returned, broke in, and gathered the occupants in the living room. Johnson asked Blasco, "What is it going to cost me?" He was told $3,000 and was reminded that defendants had direct evidence of a heroin sale. Johnson then told defendants that he could not meet their financial demands and he began to bargain with defendants about the amount of the bribe he would have to pay.

While the discussion in the living room was in progress, Jennings and Abrams directed Gloria Jean DeSavieu and her mother (two occupants of the apartment) into the mother's room. Abrams went to the bed and lifted the mattress, uncovering a cache of money: $250.00 belonging to DeSavieu and $74.00 belonging to her mother. Jennings told the mother that she could keep her money, but took DeSavieu's $250.00 and said that it would be inventoried. Jennings did not give DeSavieu a receipt for her money and the $250.00 was never returned.

Both defendants, Abrams, and Johnson then left the apartment. They got into the police car and began to drive to the police station. Johnson continued to insist that he could not obtain the entire amount of cash defendants demanded. When they neared the police station Jennings said, "[W]ell, the hell with, we are going to take the thousand."

The four then proceeded to a gas station where Johnson made two phone calls. Johnson returned to the car and said that they should drive to a nearby intersection where he could pick up the money. The four drove to near the intersection, parked under a viaduct, and waited. A car arrived at the intersection and Johnson went to meet it. When Johnson returned to the police car he gave the money to Abrams and Abrams handed it to Jennings. Defendants, Abrams, and Johnson drove off

---

2. For the purpose of analyzing defendants' Fifth Amendment challenge to their convictions, we take the factual allegations of the indictment and the Government's case at trial as true. We also focus only on the facts relating to Count I of the indictment.

3. Abrams was an acknowledged heroin user and narcotics dealer with a substantial criminal record.

and Johnson was dropped off a few blocks away. Jennings gave Abrams the heroin Abrams had purchased from Johnson. Defendants and Abrams parked the car and counted the money. Abrams was given $300.00 and defendants departed.

## II

In *United States v. Kuh*, 541 F.2d 672 (7th Cir. 1976), this court stated:

The privilege guaranteed by the Fifth Amendment not only extends to statements that would in themselves support a conviction but likewise embraces those which would furnish a "link in the chain of evidence" that could lead to prosecution, provided that the individual has reasonable cause to fear he might thereby be convicted of the crime. (Citing *Hoffman v. United States*, 341 U.S. 479, 71 S.Ct. 814, 95 L.Ed. 1118 (1951).)

*Id.* at 676. And, applying this principle, we held that a conviction under the federal misprision statute cannot stand when:

The factual allegations . . . are sufficient to engender in the defendants reasonable cause to believe that disclosing information as to their knowledge of the [underlying "actual commission of a felony"] would place them in the position of furnishing the government with evidence that could lead to their prosecution or conviction.

*Id.* at 677.[4]

The gist of the Government's argument in support of defendants' convictions is that because defendants did not participate in the Johnson narcotics sale, they would not have incriminated themselves by reporting it. This argument ignores the fact that defendants reasonably could have believed that their official report of the Johnson narcotics sale, and the events surrounding it, could have led to their prosecution and conviction for other, related criminal activities they did participate in. Defendants previously had executed similar spurious "busts" with Abrams, and it is possible, if not likely, that Johnson was familiar with defendants' *modus operandi*. Faced with criminal charges for selling narcotics, Johnson might have passed this information to police or FBI officials. Further, by the time defendants' duty to report the crime arose (upon leaving the house), defendants had already solicited bribes in front of several witnesses. And there was the danger that Abrams himself would disclose defendants' pattern of activities if he did not receive a reward for setting up the "bust;" if Johnson had been arrested and charged, the $300.00 in cash and the $25.00 package of heroin Abrams received would not have been forthcoming. Finally, Jennings walked out of the apartment with $250.00 belonging to DeSavieu which he had not provided a receipt for and which he never returned. This could have constituted evidence either of a bribe for not bringing DeSavieu to the station, or of theft.[5] Thus,

---

4. The Ninth Circuit, in its alternative holding in *United States v. King*, 402 F.2d 694 (9th Cir. 1968), adopted an identical position:

The privilege guaranteed by the Fifth Amendment not only extends to statements that would in themselves support a conviction but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute the individual for a crime, provided such individual has a reasonable cause to fear he might thereby be convicted of that crime. *See Hoffman v. United States*, 341 U.S. 479, 486, 71 S.Ct. 814, 95 L.Ed. 1118. *See also, United States v. Trigilio*, 2 Cir., 255 F.2d 385.

In our opinion, defendant had reasonable cause to believe that, if he had reported to

the authorities the information concerning the robbery which had come into his possession, he would be prosecuted as an aider and abettor, or as an accessory after the fact. *Id.* at 697.

5. The indictment charged that Jennings' departure with the $250.00 was evidence of a bribe. Count VII, ¶ 3b of the indictment alleges:

On a date unknown to the grand jury, but between September 1, 1973 and April 30, 1974, defendant Donald Jennings, being a Chicago police officer, did commit bribery in violation of the laws of the State of Illinois [Ill.Rev.Stat.1973 Ch. 38 § 33–1(d) and (e)] in that he did solicit and receive property, to wit: approximately $250 from Gloria Jean

disclosure of the Johnson-Abrams heroin sale would have provided a link in the chain of evidence which could have led to defendants' prosecution and conviction.

Relying on language in *Kuh, supra*, 541 F.2d at 677, and the district court's pretrial rulings, the Government also argues that

> . . . defendants' prosecution would run afoul of the fifth amendment privilege against self-incrimination only if the evidence showed that at the time their duty of disclosure arose, they were "*simultaneously* involved in related criminal conduct."

Appellee's Brief at 22. The Government's brief suggests that the factual circumstances described in *Kuh* (in which defendants "at the time the duty to disclose arose . . . were simultaneously involved in criminal conduct") are the only circumstances in which the privilege against self-incrimination renders a prosecution for misprision of a felony unconstitutional. The language from *Kuh* quoted by the Government, in context, suggests no such restriction. And *Kuh's* reliance on *Hoffman, supra*, 341 U.S. 479, 486, 71 S.Ct. 814, and the reasoning and language of *Kuh* itself indicate that the Fifth Amendment protection against prosecution for not disclosing and concealing a crime operates whenever the information "might tend to show he himself has committed a crime, *Lefkowitz v. Turley*, 414 U.S. 70, 94 S.Ct. 316, 38 L.Ed.2d 274 (1973)," regardless of whether the defendant was "simultaneously" involved in criminal conduct at the time the duty to disclose arose. *Kuh, supra*, 541 F.2d at 677.[6]

Even if the Government's suggested standard for determining when the Fifth Amendment precludes prosecution under the misprision statute were the law, the convictions of these defendants would have to be reversed. At the time the duty to disclose the Johnson-Abrams heroin transaction arose, defendants simultaneously were involved in criminal activity. According to the Government's evidence, Jennings only moments before had extorted $250.00 from DeSavieu. And almost immediately after they entered the apartment, defendants began soliciting a bribe. These actions (taken at the same time the duty to disclose arose) constituted "specific acts of racketeering activity" and were so designated in Counts VI and VII of the indictment.

Defendants also were charged in Count VIII of the indictment (with numerous unindicted coconspirators) with conspiring to engage in a pattern of racketeering activity. This conspiracy began, according to the indictment, prior to September 1, 1973. Thus, it had begun prior to the events surrounding Johnson's arrest. The indictment also charged that it was "part of the conspiracy that Whitelaw Abrams" (an unindicted coconspirator) was

> offered and given money and narcotics by defendants in return for identifying individuals who engaged in the illegal distribution of narcotic drugs . . . and for assisting in the seizure of said individuals while in illegal possession of narcotic drugs.

This element of the conspiracy was consummated prior to defendants' entry into the apartment. Likewise Johnson's and DeSavieu's "arrests" and the solicitation and acceptance of bribes from them constituted

---

Holston [DeSavieu], which he was not authorized by law to accept, knowing that such property was promised or tendered with the intent to cause defendant to influence the performance of an act related to his employment and function as a Chicago police officer.

**6.** The Government also cites our decision in *United States v. Daddano*, 432 F.2d 1119 (7th Cir. 1970), *cert. denied*, 402 U.S. 905, 91 S.Ct. 1366, 28 L.Ed.2d 645 (1971), and that opinion's disagreement with *King, supra*, 402 F.2d at 694, as support for affirming defendants' convic-

tions. In *Kuh*, however, we noted that, "The *Daddano* ruling . . . must be read within the context of the facts of that case," 541 F.2d at 676, and we explained the limitations on the *Daddano* holding. *Id.* at 676–77. Further, *Daddano's* disagreement with *King* does not focus on when the federal misprision statute conflicts with the Fifth Amendment; its disagreement with *King* concerns what constitutes an affirmative act of concealment for purposes of satisfying the elements of the misprision offense. Thus, *Daddano* does not control our decision in this case.

**654**

conspiratorial acts which occurred at the same time the duty to disclose Johnson's heroin sale arose. The solicitation and acceptance of bribes was not an afterthought which occurred to defendants on the way to the police station. (The DeSavieu bribe, of course, occurred even before defendants left the apartment.) The bribes, according to the indictment, were part of an ongoing criminal conspiracy, and the evidence at trial bears this out.

The Johnson-Abrams narcotics sale was designed to present the opportunity for the solicitation of a bribe. The agreement element of the conspiracy had been fulfilled long before defendants entered the apartment where the narcotics sales had been made, and their entry into the apartment and actions therein constituted overt acts in furtherance of the conspiratorial plan. Thus, their duty to disclose the Johnson-Abrams narcotics sale arose while defendants were in the midst of criminal activity, i. e., executing a criminal conspiracy; even under the legal test suggested by the Government, defendants' convictions should be reversed.

Disclosure of the Johnson-Abrams narcotics sale to appropriate authorities would have provided a link in the chain of evidence which could have led to defendants' prosecution for a variety of criminal acts. Thus, Count I of the Government's indictment, applying the federal misprision statute to the facts of this case, violated defendants' Fifth Amendment privilege against self-incrimination.

The judgments of conviction are reversed.